Filed 4/13/16  P. v. Gallardo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040518 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C9361672) |
| v. | |
| ESTEBAN HERNANDEZ GALLARDO, | |
| Defendant and Appellant. | |

Defendant Esteban Hernandez Gallardo was convicted by a jury of two counts of continuous sexual abuse of a minor (Pen. Code, § 288.5, subd. (a)),[1] but was acquitted of one count of lewd and lascivious conduct with a child under 14 years of age (§ 288, subd. (a)).  He was subsequently sentenced to an aggregate term of 32 years in prison, consisting of consecutive 16 year terms on each count.

On appeal, Gallardo argues his conviction must be reversed because:  (1) his speedy trial rights were violated; (2) the trial court erred in limiting the testimony of his expert witness; (3) the trial court erred in admitting testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS); and (4) the trial court erred in excluding evidence of one of the victim's prior sexual conduct.

We find no merit to any of Gallardo's arguments and will affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

　　　A.     *Prosecution's case*

　　　　　1.     *Victim 1*

Victim 1 was born in 1982, and was 30 years old at the time of trial.  As a child, victim 1 lived in a one-bedroom apartment in San Jose with her older sister (victim 2), their mother, grandmother, aunts, uncles, cousins and Gallardo, a friend of the family.  Some of the household members slept in the bedroom while others slept in the living room.  Victims 1 and 2 slept in a bedroom with their mother, grandmother, cousins, and Gallardo.  The room had a queen size bed and bunk beds, and in all, about 10 people slept there.  The two victims, their mother, and Gallardo slept on the floor on a blanket.  Though he occasionally left the house for a few days, Gallardo was otherwise always around.

Victim 1 testified that, when she was little, Gallardo touched her in a way she did not like.  The first time it happened was in the bedroom where she slept with the others, including Gallardo.  She woke up in the night and found herself on top of Gallardo, who then moved her to his other side, away from her mother.  Victim 1 could see Gallardo's face as there was light coming from both the window and the door to the kitchen.  He put his hand under her pajamas and touched her breast and vagina.  She did not understand what was happening, so she did not cry out.  Victim 1 thought she was seven or eight years old at the time, and the touching took place "almost like [*sic*] every night he was there."  She hated going to sleep and asked her mother if she could not sleep there.  Victim 1 also asked victim 2 to switch sides with her.  However, she did not tell her mother or sister why.

Victim 1 testified the touching got worse.  Gallardo would, unsuccessfully, try to put his penis in her vagina.  Victim 1 recalled a couple of times where she could feel his penis pressing against her vagina and it was uncomfortable.  This happened more than once, possibly a couple of times.

2

Victim 1 also felt Gallardo's fingers in her vagina on more than one occasion, saying "It happened a lot." Gallardo would kiss her "breast area" but never put his mouth or tongue on her vagina. Gallardo told victim 1 not to tell anyone and that he "wanted to be able to keep doing things" when she got older. She tried to avoid him during the day, but thought she was never going to get away from him.

Victim 1 was unable to recall exact dates, but estimated her age and when the molestations occurred. At some point, she and her family moved to another apartment and by that time, she believed the molestations had gone on for a couple of years. Victim 1 never talked to victim 2 about what Gallardo was doing at the time, but may have talked about it once when she was around 12 years old. At that point, the molestation had stopped and Gallardo was no longer living with their family.

During a conversation with her sister in 1993, victim 1 discovered victim 2 had also been molested by Gallardo. They decided to report what happened to an adult. They first told their mother's boyfriend, Sergio Tabares, and then told their mother. Victim 1 was subsequently interviewed at her school by a police officer. She did not talk to her sister about the molestation again, however, and testified she was absolutely certain Gallardo had molested her.

### 2. *Victim 2*

Victim 2 was born in 1981 and, at the time of trial, was 31 years old. She is one year older than her sister, victim 1. She testified she grew up in a one-bedroom house in San Jose with victim 1, their mother, grandmother, uncles, aunt, and Gallardo. She recalled half of the people in the house slept in the living room and the other half in the one bedroom.

Victim 2 slept in the bedroom with her mother, sister, grandmother and aunt, but she testified Gallardo did not sleep in that room with them. When asked why he was staying with them, she said she assumed Gallardo was a friend of the family, and she recalled he lived with their family for years. Victim 2 could not recall how old she was

3

or what grade she was in when Gallardo first moved in. She never saw Gallardo molesting victim 1 in the bedroom.

When she was a little girl, maybe between six and nine years old,[2] Gallardo touched her in a way she did not like. Victim 2 admitted she did not have a precise memory of her age or how long ago the molestation occurred, but she believed it lasted two years.

The first time Gallardo touched her was when she was on the couch in the living room watching television. Gallardo told victim 2 to go behind the couch and take off her clothes. He then kissed her breasts, took off her underwear and tried to put his penis in her vagina. The tip of his penis went between the lips of her vagina. Victim 2 told Gallardo it hurt and asked him to stop, but Gallardo told her, "one more time." She tried to move away, but could not completely get away from him. After Gallardo molested victim 2, he told her to watch television and not to turn around. He then took victim 1, who was in the room watching cartoons, behind the couch with him.

Gallardo molested victim 2 every time he was alone with her or when others were at work, but all of the molestations occurred during the day. He told her to tell her mother that she was sick so victim 2 would stay home from school. Victim 2 did so, but she did not want to stay home with Gallardo alone.

The second incident she recalled occurred in the bedroom during the day. Gallardo took off her pants and put his penis on top of her vagina, rubbing it between the lips without penetrating her. Victim 2 did not know what he was doing and said she did not have an understanding about sex or sexual acts at that time.

Gallardo frequently licked or kissed her breasts, but did not put his fingers in her vagina. One time, he put his tongue or his mouth on victim 2's vagina. He told her to take off her pants and underwear, but they would be under some covers so victim 1, who

---

[2] Victim 2 later testified she was in seventh grade when Gallardo molested her.

4

was also home watching television or coloring, would not see. Victim 2 testified Gallardo would touch her in a sexual way "[e]very chance he would get," frequently caressing her head and then asking her to lie down.

Victim 2 and her family eventually moved and Gallardo did not live with them in their new residence. She recalled the molestations occurring during the school year and lasting for a while. One summer while in elementary school, victim 2 went on a trip to Mexico with her family, including victim 1. She could not recall if Gallardo still lived with them after that trip.

After her family moved, victim 2 spoke with her sister about what Gallardo had done to them. That same day, the two girls told their mother's boyfriend, Tabares, and then told their mother about Gallardo. Victim 2 recalled being interviewed by a therapist, rather than a police officer. On cross-examination, victim 2 said she remembered being interviewed by a police officer but could not recall any details about that interview, which took place two to three years after the molestation. She did not recall if her sister was there during the interview or if she was present when victim 1 was interviewed.

Since that first discussion with her sister, victim 2 has not talked to victim 1 about what Gallardo had done to them. Victim 2 did not know why she had not told her sister while the molestation was happening. She did not know it was a bad thing, but she was scared. She was absolutely certain Gallardo had molested her and the abuse was continuous until they moved.

### 3. Arthur Serenil

Serenil, a retired San Jose police officer, testified at trial. He was serving in the military in Iraq in 2003 when he sustained injuries which affected his memory. Serenil was a detective in the sexual assault unit from 1990 to 1993. While he was part of that unit, he interviewed two sisters, victims 1 and 2, at Castro Middle School in 1993. Serenil interviewed the girls separately in the principal's office, although the principal was present during each interview. Serenil testified generally about his training and the

5

techniques he used when interviewing children in sexual assault cases, such as building rapport with the child, avoiding leading questions, and focusing on big events in their lives in order to determine the timing of particular incidents. Although he could not independently recall the interviews with victims 1 and 2 apart from the police reports, Serenil assumed he applied those techniques.

According to the police report, victim 2 told Serenil that Gallardo first molested her when she was nine years old. Victim 1 reported the first molestation by Gallardo occurred when she was seven or eight years old. Victim 1 told Officer Serenil that she was "raped" "a lot by [Gallardo] when she was ten years old." Serenil also interviewed the victims' grandmother, their mother, and one of their cousins,[3] during the investigation of the case.

### 4. *Miriam Wolf*

Wolf, a licensed clinical social worker, testified about CSAAS. According to Wolf, CSAAS first appeared in a 1983 article, authored by Dr. Summit,[4] in a journal on child abuse and neglect. The article described patterns of behaviors observed in children who were victims of abuse and sought to dispel common myths about how children behave in these situations. It was not a research article nor was it intended for use as a clinical diagnostic tool to determine if a child was, in fact, abused or molested. Wolf was not involved in the investigation of this case and did not review the police reports which were prepared in that investigation. She was not aware of what the victims said and could not offer an opinion on the accuracy of their statements or whether Gallardo was guilty or not.

Wolf explained to the jury that the five patterns of behavior in CSAAS are: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted

---

[3] This cousin was called as a defense witness.

[4] Dr. Summit's full name does not appear in the record.

or unconvincing disclosure; and (5) retraction. Secrecy involves children not disclosing sexual abuse right away, often waiting long periods of time to do so. Helplessness occurs when there is a child victim and someone who is older or in a position of power. There is a developmental, physical, and psychological or emotional helplessness on the part of the child. A child experiences helplessness because they feel they cannot go to the people they would normally turn to for help. Delays in disclosures are more common when the abuser is a family member or someone close to the family.

Wolf testified that the concept of entrapment and accommodation in CSAAS involve children feeling trapped in their situation and figuring out a way to live normally while the abuse is occurring. She explained that delayed, conflicted or unconvincing disclosure means that the disclosures do not occur all at once but instead come out a little at a time, often hesitatingly and conflicted especially if the abuser is someone they know and trust. It has been documented that when making disclosures of abuse, children get confused, mix up dates, or are unable to give dates and times. Retraction, the final element of CSAAS, involves children recanting their statements when they experience the negative consequences that result, such as a loved one being arrested, the child having to leave home, or family members becoming upset and blaming them.

According to Wolf, since the initial publication of his article, Dr. Summit has expressed concerns that his article has been misused and the term "syndrome" is a misnomer. In a subsequent article published in 1994, Dr. Summit, a psychiatrist, regrets using "syndrome" in describing his observations because he believes it leads people to use CSAAS as a diagnostic tool.

B. *Defense case*

1. *Dr. Bruce Yanofsky*

Dr. Yanofsky, a clinical and forensic psychologist, testified about his psychological evaluation of Gallardo. In preparing for his evaluation, Dr. Yanofsky reviewed the records in Gallardo's case and the victims' testimony from the preliminary

7

hearing before conducting a clinical interview with Gallardo and subjecting him to several objective psychological tests. Based on that evaluation, Dr. Yanofsky opined that Gallardo did not "present[] with any mental health diagnosis or condition that would predispose him to sexual crimes of any sort." In all, Dr. Yanofsky spent approximately 10 hours with Gallardo in two clinical interviews and performed eight psychological tests.

Dr. Yanofsky testified that Gallardo's IQ test indicated he was of below average intelligence, principally because of his lack of education and illiteracy. Dr. Yanofsky also conducted an extensive test on Gallardo designed to measure the sexual characteristics of an adult male alleged to have committed a sex offense.[5] The results of this test indicated Gallardo's commonality with a group of known child molesters was very low.

Gallardo also scored low on a test for determining psychopathy, and Dr. Yanofsky testified this result indicated Gallardo was not the type of person who would likely engage in cruel, callous, violent or sexually violent behavior, nor was he someone who would feel no remorse or guilt. Gallardo's self-reported sexual history did not disclose a sexual interest in children and his relationships have been "age-appropriate consensual relationships."

On cross-examination, Dr. Yanofsky agreed that a person can molest a child and not be diagnosed as a pedophile. He indicated it is difficult, based on a psychological profile alone, to determine whether or not someone is a sexual criminal. Based on Gallardo's psychological profile, he was not a pedophile, but Dr. Yanofsky clarified he was not opining whether Gallardo did in fact commit the molestations in this case.

_____

[5] Gallardo was asked to sign a consent form for this test, and in doing so, signed the name "Jesus Gomes." However, as discussed below, Gallardo also went by "Jesus Gomez." Which was the name on the driver's license in his possession at the time of his arrest, as well as how he signed a prebooking form.

## 2. *Victims' older cousin*

The victims' cousin, who was born in 1974, lived with the victims in 1991. She first arrived in the United States in 1990 and has known Gallardo since that time. The last time the victims' cousin saw Gallardo was at a family party in 2010. She recalled that when she was 16 years old, Gallardo lived at her aunt's house for a while but later moved out. Gallardo slept in the living room and never tried to touch her in a sexual way. He would often give her a ride to her part-time job on the weekends, but never touched her or acted in a way that made her uncomfortable.

The victims' mother took her to the police in September 1993 to be interviewed about Gallardo. The cousin denied telling police during that interview that Gallardo continually tried to touch her in a sexual way and the only reason he did not was because she had stopped him. She also denied telling police Gallardo had thrown an adult magazine at her after she had returned from a trip to Mexico, and denied ever having gone back to Mexico after she moved to the United States. She denied having told the police that Gallardo tried on at least three occasions to touch her arm close to her breast while giving her a ride to work. The victims' cousin indicated she never made any of the statements attributed to her in the 1993 police report.

## 3. *Dr. Rahn Minagawa*

Dr. Minagawa, a clinical and forensic psychologist, testified about CSAAS for the defense. Dr. Minagawa indicated that CSAAS has been subject to some criticism in the field of psychology, with a number of articles questioning whether CSAAS is a syndrome, and whether it qualifies as science. The five elements associated with CSAAS are not always present and the descriptions of some of the elements, such as delayed reporting, are vague. Delays could be based on different factors of the child such as age and environment. According to Dr. Minagawa, one of the problems with using CSAAS in the legal setting is that it can confuse individuals who are not familiar with scientific

9

principles and who may consequently give it more weight than it deserves. CSAAS has not been accepted as a real syndrome and it assumes that abuse, in fact, has occurred.

### 4. Aracely Maldonado

Maldonado, Gallardo's niece, testified she has known Gallardo since she was five years old. He would live with her family for several months, leave and then return to live with them. Maldonado recalled he lived with them in 2002 or 2003 when she was 15 or 16 years old. Gallardo never tried to touch her in a sexual way. Although the two victims are her cousins, they are not very close and she is four or five years younger than them.

Maldonado thinks she saw Gallardo when she attended her aunt's funeral three or four years ago. She testified that the two victims were also at that funeral. The last time Maldonado saw Gallardo was one or two months before he went to jail. She considers her relationship with him to be close and does not believe he is the kind of person who would molest children.

When she was about 18, she learned that Gallardo was going under the name, "Jesus Gomez."[6] She was confused by this but never asked her mother about it because it was "none of my business." Although she was not close to the victims, she did not know them to be liars or to make up things against people.

### C. Verdict and sentencing

On April 26, 2013, the jury found Gallardo not guilty on the charge of lewd and lascivious conduct on a child under age 14 (§ 288, subd. (a), count 1), but guilty of two counts of continuous sexual abuse of a child (§ 288.5, subd. (a), counts 2 & 3). Gallardo was sentenced to a total term of 32 years in prison on counts 2 and 3.

---

[6] See footnote 5, *ante*.

## II.    DISCUSSION

### A.    *Gallardo's speedy trial rights were not violated*

Gallardo argues the 18 year delay in prosecuting this case after the initial complaint was filed violated his state and federal right to a speedy trial.  We disagree.

Before discussing the applicable legal standards, we set forth the following relevant undisputed facts.  After the victims reported what happened, Gallardo was interviewed by police about the allegations on September 24, 1993.  On October 19, 1993, the prosecution filed a felony complaint against Gallardo, but could not locate him to arrest him.[7]  On September 30, 2011, Gallardo was arrested in an unrelated matter, in possession of a driver's license in another name.  During the booking process, his identity was discovered and Gallardo was arrested on the 1993 charges.

#### 1.    *Legal standards*

" ' "[D]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.  A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay.  The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*).)

"Prejudice may be shown by ' "loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay." ' [Citations.]  And although the federal constitutional standard for what constitutes sufficient justification for delay is unclear [citation], [the California Supreme Court has] noted that 'the law under the California Constitution is at least as favorable for defendant

---

[7] We address the steps taken to locate Gallardo and the reasonableness of those efforts below.

11

in this regard' as federal law [citation]. Accordingly, . . . we apply California law here." (*Cowan*, *supra*, 50 Cal.4th at pp. 430-431.)

"Under the California standard, 'negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. This does not mean, however, that whether the delay was purposeful or negligent is irrelevant.' [Citation.] Rather, 'whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' [Citation.] The justification for the delay is strong when there is 'investigative delay, nothing else.' " (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

"[D]ifferent weights should be assigned to different reasons [for delay]. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily . . . . Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." (*Barker v. Wingo* (1972) 407 U.S. 514, 531, fn. omitted.) A delay may also be attributed to the defendant as when he flees the jurisdiction to avoid trial. (*People v. Perez* (1991) 229 Cal.App.3d 302, 308.)

The appellate court "review[s] for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer[s] to any underlying factual findings if substantial evidence supports them [citation]." (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

>    2.    *Gallardo's showing of prejudice*

Gallardo argues the delay in bringing him to trial was prejudicial because certain witnesses helpful to his defense died or moved away and could not be located. He also

claims that the deterioration of witness memories was harmful to his defense. We examine the specifics of each of his claims below.

### a. *The victims' grandmother*

On September 24, 1993, Officer Serenil and Officer Robert Dominguez spoke with the victims' grandmother about their claim that Gallardo molested them. She told them "she did not believe any of the allegations." She stated that Gallardo "lived with her family for approximately eight years and has help[ed] financially with the running of the household." She also told police "nothing has occurred because [Gallardo] would only be alone with the victim *when he would give her a ride to work*." (Italics added.)

The victims' grandmother died in 2008.

As noted by the trial court in its written order denying the motion to dismiss, the victims' grandmother was simply not a material witness in this case. The statements she made to the police in 1993 were made in response to questions about allegations that Gallardo had molested *two different victims*, including the victims' older cousin.[8] We have no way of knowing what the victims' grandmother might have said about the allegations that Gallardo molested the victims, since she was not asked about those allegations in 1993. To the extent that the victims' grandmother could have been called as a character witness, there were two other witnesses, i.e., Gallardo's niece and Dr. Yanofsky, who testified that Gallardo was not the type of person who would molest a child. Accordingly, the death of this witness prior to his trial resulted in little to no prejudice to Gallardo's defense.

### b. *Officer Serenil's memory loss*

Gallardo next claims that, due to the delay, Officer Serenil, the investigating officer, had no independent recollection of the investigation he conducted. Furthermore,

---

[8] This is the same cousin called by the defense at trial who testified she did *not* tell police during her interview in 1993 that Gallardo had touched her inappropriately.

13

Serenil had suffered injuries during his military service in Iraq which affected his memory. As a result, Gallardo could not effectively cross-examine Serenil about his interviewing techniques.

However, defense counsel did question Serenil about his training in interviewing children, his interviewing techniques, and whether those techniques were likely employed in his interviews of victims 1 and 2. The defense was also able to argue that Serenil's memory had faded and therefore there was no way to verify he actually used proper interviewing techniques in 1993, suggesting the allegations contained in his report were the result of a flawed investigation.

Gallardo has not shown that he was prejudiced by Serenil's faded or incomplete memory. Serenil testified his memory of the details of the case was refreshed by his report, which is a common occurrence even in cases which go to trial within a few years of a suspect's arrest. The jury was able to evaluate Serenil's credibility during his testimony about the training he received in interviewing children and the techniques he followed during such interviews.

### c. *Inability to locate other witnesses*

Finally, Gallardo contends that due to the delay, the defense was not able to locate two important witnesses: (1) Ms. Cole,[9] the school principal who was present when Serenil interviewed the victims; and (2) Maria Placer, the Child Protective Services (CPS) worker who was the original reporting party. Gallardo argues Cole could have potentially provided testimony regarding Serenil's interview techniques with victims 1 and 2, and Placer wrote in her report that the victims stated the sexual molestation "happened 2 years ago," i.e., from 1990 through 1992. However, during trial, the parties stipulated Gallardo "was in custody for a narcotics offense from October 22, 1990 to July 1992."

---

[9] Serenil's written report does not include Cole's first name.

14

Cole and Placer were not material witnesses to the defense. It is nothing more than speculation to suggest that Cole could have provided testimony to impeach Serenil regarding his interviewing techniques. It is just as likely that Cole's testimony would have supported the prosecution's case, assuming she recalled anything specific about the events at all.

Similarly, the evidence that victims 1 and 2 made statements indicating that Gallardo molested them at a time when he was incarcerated was available in Serenil's police report. Gallardo was able to solicit testimony from victims 1 and 2 about the dates during which they claimed Gallardo molested them, and defense counsel argued to the jury that, based on their testimony, Gallardo was in custody at the time and could not be guilty. Placer's testimony about the dates of the molestations would not have been any more helpful to the defense than the testimony from the victims themselves.

### 3. *Delay was justified*

Even were we to assume, however, that Gallardo could show some prejudice from any of the above, the delay in prosecution was neither intentional nor negligent. In fact, the record is clear that the delay was attributable to Gallardo himself.

Gallardo was interviewed by police about the molestation allegations on September 24, 1993. At an Evidence Code section 402 hearing during trial, but outside the presence of the jurors, Serenil testified about the efforts made to locate Gallardo and serve the arrest warrant which had been issued in October 1993, based on his review of the police file. Serenil said that he asked Gallardo for a new address since he had apparently moved, but Gallardo could not give him one. Serenil indicated the Sunnyvale police department attempted to locate Gallardo at a specific address, provided by either Gallardo or his employer, but determined there was no such address in Sunnyvale.

Serenil testified there was a note in his file to the effect that he was informed by someone that Gallardo had fled to Mexico. Serenil did not make note of who told him that and he had no independent recollection of that conversation.

15

Gallardo was ultimately arrested in an unrelated matter on September 30, 2011. During the prebooking process for that arrest, Gallardo was carrying a California driver's license in the name of "Jesus M. Gomez" and that is the name he signed on a prebooking form. The police discovered Gallardo's outstanding warrant when his fingerprints were entered into the fingerprint identification system and he was arrested in the present case. Gallardo's use of a false name during the period between 1993 and 2011 was corroborated by Maldonado, who testified at trial she learned that Gallardo was going by the name "Jesus Gomez" about seven years prior to the 2013 trial.

Gallardo relies on testimony from Maldonado and the victims' cousin that he was present at "family events over the years" including a funeral in 2009 or 2010 and a party in 2010. This evidence is insufficient to establish intentional or negligent delay on the part of the People. Even if true, it does not counter the People's evidence that Gallardo, upon learning he was under investigation for child molestation, sought to avoid arrest by failing to provide a valid address and by using a false name, even going so far as to procure a driver's license with that alias.

Consequently, we find there is substantial evidence supporting the trial court's factual findings on Gallardo's motion to dismiss and that the trial court did not abuse its discretion in denying that motion.

B.      *No error in restricting Dr. Yanofsky's testimony*

Gallardo argues the trial court erred in precluding his expert, Dr. Yanofsky, from opining that, based on Gallardo's personality, he would be more prone to confess if he were guilty of the crimes in question. In his view, the limitation on Dr. Yanofsky's testimony violated his rights to due process and a fair trial, as well as his right to present a defense. We disagree.

1.      *Relevant facts*

In an in limine motion, the prosecution sought to "[p]reclude Dr. Yanofsky from opining that defendant would have been more prone to confess if he was guilty."

16

In Dr. Yanofsky's report detailing his psychological evaluation of Gallardo, he referenced a study[10] "describ[ing] several factors associated with confessing or not to a sexual crime during police interrogation." Dr. Yanofsky wrote that Gallardo was a "relatively quiet and introverted individual who according to this research would have been more prone to confess had he committed the offense." The prosecution argued such testimony was "inherently unreliable, and just because a person commits a crime does not mean they are going to confess to it."

In its ruling excluding the testimony in question, the trial court emphasized that Dr. Yanosky was not qualified as an expert to render an opinion on confessions and thus his opinion on this issue would be inadmissible. "Yanofsky was hired to render an opinion regarding whether the defendant had characteristics of a child molester. That is Yanofsky's proffered area of expertise. . . . Yanofsky does not have expertise in police interrogations, tricky police interrogations, and the likelihood of the introverted defendant as it relates to which questions were asked of defendant when he gave a statement to the police. Yanofsky does not even know what questions were asked by the police. Even if Yanofsky did know the questions, he lacks expertise in confessions. There is a foundation deficiency and an expertise deficiency."

### 2. Legal standards

In order to testify as an expert, a witness must have special knowledge, skill, experience, training or education in the subject area of his proposed testimony. (Evid. Code, § 720, subd. (a).) "Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an

---

[10] The citation provided in Dr. Yanofsky's evaluation was to "Beauregard, et al. (2010). Interaction Between Factors related to the Decision to Confess During Police Interrogation: A Classification Tree Approach. Sexual Abuse, Vol. 22, No. 3 September 2010." This article was not provided to the trial court and is not part of the record on appeal.

17

expert." (*Ibid.*)  In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited.  (*People v. King* (1968) 266 Cal.App.2d 437, 445.)  It is left to the trial judge's discretion to determine if that standard has been met.  (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175.)

### 3.    *Analysis*

Dr. Yanofsky was qualified to testify as a *Stoll*[11] expert in this case.  He was not offered as an expert on confessions nor was evidence presented on his qualifications in that area.  In the absence of an adequate foundation, the trial court properly determined that Dr. Yanofsky was not permitted to render an opinion about whether someone accused of child molestation would be more likely to confess when subjected to interrogation if the accused has an introverted personality as opposed to an extroverted one.  There was no indication that this subject fell within the confines of Dr. Yanofsky's expertise and defense counsel advised the trial court she could not overcome the foundational hurdles necessary to question Dr. Yanofsky on the topic.[12]

Even without being permitted to offer an opinion on Gallardo's proclivity to confess were he guilty, Dr. Yanofsky still presented testimony explaining his professional opinion that Gallardo was not likely to have committed the alleged crimes.  Dr. Yanofsky evaluated Gallardo to determine if he is "an individual who is likely to commit sexual crimes or might have commit[ted] sexual crimes which he stands accused of," and found that Gallardo's commonality with known child molesters "was really low."  He further opined that Gallardo "is not the type of individual who would likely engage in very cruel,

---

[11] The California Supreme Court, in *People v. Stoll* (1989) 49 Cal.3d 1136, 1140-1141 (*Stoll*), held that an expert's opinion that a defendant did not show signs of sexual deviancy or pedophilic traits was admissible character evidence.

[12] The trial court expressly advised the parties it would be open to reconsidering its ruling "[s]hould the defense establish the foundation (Yanofsky studied the questions that were put to the defendant [by police]) and establish the expertise of Yanofsky in this area (as an expert on who is likely to confess)."  The defense did neither.

callous, violent or sexually violent behavior." The jury was permitted to hear all this evidence and weigh it against the other evidence presented.

Accordingly, the trial court did not err in granting the in limine motion.

*C.    No error in admitting CSAAS testimony*

Gallardo next argues the trial court erred in denying his motion in limine and allowing Wolf to offer testimony regarding CSAAS. Gallardo contends this evidence is inadmissible because it did not meet the requirements of the *Kelly*/*Frye*[13] test. However, the *Kelly*/*Frye* rule governing the admissibility of scientific evidence is inapplicable here because the CSAAS evidence was not admitted to prove that the victims had been molested. (See *People v. Harlan* (1990) 222 Cal.App.3d 439, 449, citing *Stoll*, *supra*, 49 Cal.3d at p. 1161.) Rather, Wolf's testimony was admitted " 'for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation.' " (*People v. Wells* (2004) 118 Cal.App.4th 179, 188.)

A trial court has broad discretion in deciding whether to admit or exclude expert testimony, and its decision will not be reversed on appeal unless a manifest abuse of discretion is shown. (*People v. McDowell* (2012) 54 Cal.4th 395, 426; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*); *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001.) Expert testimony is admissible on any subject sufficiently beyond common experience such that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a); *People v. Brown* (2004) 33 Cal.4th 892, 905.)

It is well established that CSAAS "evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394

---

[13] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013. Although *Frye* was superseded by statute (*Daubert v. Merrell Dow Pharmaceuticals, Inc*. (1993) 509 U.S. 579; *People v. Leahy* (1994) 8 Cal.4th 587, 591-592), the test is still commonly cited as the *Kelly/Frye* rule.

19

(*Bowker*).)  The California Supreme Court has acknowledged that this type of evidence, offered for this purpose, is admissible.  (*People v*. *Humphrey* (1996) 13 Cal.4th 1073, 1088 [evidence of battered women's syndrome]; *McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301 [evidence regarding parental reluctance to report child molestation].)

The necessity for such evidence arises when the victim's credibility is attacked by a defendant's suggestion that the victim's conduct after the incident, e.g., a delay in reporting, is inconsistent with his or her testimony claiming molestation.  (*People v*. *Gilbert* (1992) 5 Cal.App.4th 1372, 1383.)  "[A]t a minimum the [CSAAS] evidence must be targeted to a specific 'myth' or 'misconception' suggested by the evidence. [Citation.]  For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust.  Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings.  In the typical criminal case, however, it is the People's burden to identify the myth or misconception the evidence is designed to rebut.  Where there is no danger of jury confusion, there is simply no need for the expert testimony."  (*Bowker*, *supra*, 203 Cal.App.3d at pp. 393-394.)

However, "[i]dentifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation.  It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation."  (*People v*. *Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.)

Even when it appears that CSAAS evidence may be admissible, use of the evidence is subject to certain procedural safeguards.  To guard against the danger that a

jury might improperly evaluate CSAAS evidence and view it as proof of a defendant's guilt, the jury must be instructed that "the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.) Jurors "must understand that CSAAS research approaches the issue from a perspective opposite to that of the jury. CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience." (*Ibid*.) If a trial court adheres to these procedural safeguards, testimony regarding CSAAS is admissible for the limited purpose described. (*Id*. at pp. 393-394.)

The trial court here properly instructed the jury on how it should view the CSAAS testimony, stating that the testimony was "not received and must not be considered by you as proof that the alleged victims' molestations or rapes is true." The jurors were further instructed that that they could "consider the evidence concerning this syndrome and its affect [*sic*] only for the limited purpose of showing, if it does, that the alleged victims' reactions as demonstrated by the evidence are not inconsistent with them by having been molested or raped." This instruction satisfied the stricture set forth in *Bowker*, *supra*, 203 Cal.App.3d at page 394.

Contrary to Gallardo's assertion, CSAAS evidence was not offered in this case to establish that he did molest the victims, but rather to assist the jury in understanding how the victims' actions were not "inconsistent with having been molested." (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.) The trial court's instruction to the jury is entirely consistent with the limited purpose for which CSAAS is admissible. Inconsistencies in a witness's account directly influence that witness's credibility with the jurors; otherwise attorneys would not devote so much effort seeking to highlight such inconsistencies at trial. CSAAS evidence is admitted in order to show that the victim's reactions as demonstrated by the evidence are not necessarily inconsistent with having been molested. Therefore, the jurors should not automatically view any such "inconsistencies" as a reason to find

the victim's testimony lacking in credibility. The trial court's instruction merely reinforced the limited purpose for which the CSAAS evidence was introduced.

Accordingly, we find no abuse of discretion in admitting the CSAAS evidence and further find that the jury was properly instructed on how to evaluate that evidence.

### D.     *No error in excluding evidence of victim 1's subsequent molestation*

Gallardo next argues the trial court erred in excluding evidence that victim 1 was molested by Tabares, her mother's boyfriend, around the time she disclosed the alleged molestation by Gallardo. He claims this violated his rights to due process, a fair trial and his right to present a defense.

### 1.     *Relevant factual background*

The defense brought an in limine motion to admit evidence, pursuant to Evidence Code section 782, that victim 1 had been sexually molested by Tabares in 1993. Gallardo argued the evidence was relevant to victim 1's credibility on two theories: (1) the evidence would explain an alternative source of injuries or physical evidence;[14] and (2) the evidence would provide an alternative source of victim 1's sexual knowledge.

The trial court summarized the relevant chronology as follows:

"[Gallardo] allegedly molested the two girls from August 6, 1989, to October 22, 1990. [Gallardo] went to prison on another matter on or about October 22, 1990, and never returned to the home of the girls. The girls moved to a new home. [Gallardo] did not come to live with the girls' family at their new home when [Gallardo] was released from prison. On September 10, 1993, [victim 1] and [victim 2] reported to their mother and their mother's boyfriend Sergio Tabares that the girls were sexually assaulted by their grandmother's boyfriend—[Gallardo]—about two to three years prior to

---

[14] The trial court ruled that, if the prosecution introduced evidence of victim 1's sexual assault response team (SART) examination, the evidence of Tabares' molestation of her would be admissible. However, the prosecution disavowed any intention of introducing victim 1's SART examination at trial and did not do so.

22

September 10, 1993. A CPS report was taken and then San Jose Police Officer Arthur Serenil interviewed the girls separately on September 24, 1993. . . . On February 11, 1994, [victim 1] reported her mother's boyfriend Sergio Tabares was molesting her. [Victim 1]'s mother confronted Mr. Tabares. He admitted the sexual assault of touching [victim 1]. Police interviewed Mr. Tabares and he confessed. Mr. Tabares indicated the sexual assault happened between September 1993 and January 1994. . . . This was long after defendant was no longer living with the girls' family, and it was possibly during the time that [victim 1] reported to Mr. Tabares and [victim 1]'s mother that [Gallardo] had molested her. Based on the report, the People charged Mr. Tabares with sexual assaults that allegedly occurred between September 1, 1993 and February 6, 1994. Mr. Tabares plead[ed] guilty to sexually assaulting one girl and the other charge regarding the second sister was dismissed.[15]" (Original fns. & underscore omitted.)

The trial court denied the defense motion.

Gallardo renews the argument he raised below that under Evidence Code sections 782 and 1103, sexual conduct of a complaining witness can be offered to attack their credibility. Because victim 1 was being molested by Tabares in 1993, around the time she disclosed the past molestation by Gallardo, Tabares' molestation was an alternate source of her sexual knowledge and would have undermined the credibility of her allegations against Gallardo.

"A defendant generally cannot question a sexual assault victim about his or her prior sexual activity." (*People v. Bautista* (2008) 163 Cal.App.4th 762, 781, citing *People v. Woodward* (2004) 116 Cal.App.4th 821, 831.) An exception exists when evidence of the complaining witness's prior sexual history is "offered to attack the credibility of the complaining witness as provided in [Evidence Code] Section 782." (Evid. Code, § 1103, subd. (c)(5).) "Evidence Code section 782 provides for a strict

_____

[15] Victim 2 did not report being molested by Tabares.

23

procedure that includes a hearing outside of the presence of the jury prior to the admission of evidence of the complaining witness's sexual conduct. [Citations.] Evidence Code section 782 is designed to protect victims of molestation from 'embarrassing personal disclosures' unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility. [Citation.] If, after review, 'the court finds the evidence relevant and not inadmissible pursuant to Evidence Code section 352, it may make an order stating what evidence may be introduced and the nature of the questions permitted.' " (*People v. Bautista*, *supra*, at p. 782.) "By narrowly exercising the discretion conferred upon the trial court in this screening process, California courts have not allowed the credibility exception in the rape shield statutes to result in an undermining of the legislative intent to limit public exposure of the victim's prior sexual history." (*People v. Chandler* (1997) 56 Cal.App.4th 703, 708.) Stated another way, the credibility exception to the inadmissibility of a complaining witness's prior sexual conduct should not "impermissibly encroach upon the rule itself and become a 'back door' for admitting otherwise inadmissible evidence." (*People v. Rioz* (1984) 161 Cal.App.3d 905, 919.)

We review the trial court's ruling in denying the admission of sexual conduct for an abuse of discretion. (*People v. Chandler*, *supra*, 56 Cal.App.4th at p. 711.) We will not disturb a court's exercise of its discretion "*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)

Gallardo fails to carry his burden to demonstrate an abuse of discretion. As is apparent, Gallardo's argument is a reargument of his position rather than a showing that the trial court's ruling was arbitrary, capricious, or patently absurd. Moreover, Gallardo could not demonstrate that the trial court's irrelevancy ruling was arbitrary, capricious, or patently absurd.

Gallardo's theory of relevance presupposes that victim 1's knowledge of sexual terms came from Tabares' molestation of her. This claim is speculative, at best. There was no evidence the Tabares molestation occurred before victim 1 reported Gallardo's molestation in September 1993, and thus it cannot be concluded that she described Gallardo's act of "raping" her from sexual knowledge obtained from Tabares. Moreover, victim 1 was 11 years old and in the sixth grade when she made the report against Gallardo and just as easily may have obtained knowledge about sex from a variety of sources, such as sex education at school, discussions with her friends or with her mother.

### E. *No cumulative error*

Gallardo's final argument is that cumulative error warrants reversal. A claim of cumulative error "is in essence a due process claim." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

Here, we are satisfied that Gallardo received due process and a fair trial. As explained above, Gallardo has failed to show any error that infringed his due process rights. Moreover, Gallardo "was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) Gallardo's trial was fair, and his claim of cumulative error fails.

## III.  DISPOSITION

The judgment is affirmed.

25

                                        _____

                                                  Premo, J.

WE CONCUR:


_____
Rushing, P.J.




_____
Elia, J.




People v. Gallardo
H040518